# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PULSEDATA, INC., | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| JUNG HOON SON, | ) |
|  | ) |
| *Defendant,* | ) |
|  | ) |

Civ. No. 1:23-cv-03653-JMF

**JURY TRIAL DEMANDED**

**PLAINTIFF PULSEDATA, INC.'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR A PRELIMINARY INJUNCTION
AGAINST DEFENDANT JUNG HOON SON**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ 1

TABLE OF AUTHORITIES ............................................................................... 2

INTRODUCTION .............................................................................................. 4

STATEMENT OF FACTS ................................................................................. 5
    A.    Overview of Jung's Violations ......................................................... 5
    B.    pulseData's Trade Secret ................................................................. 7
    C.    Dr. Jung's Employee Non-Disclosure and Invention Assignment Agreement .... 8
    D.    Jung Secretly Moonlighted for a Competitor While Employed by pulseData ... 10
    E.    Jung's Coverup ............................................................................... 11

ARGUMENT ................................................................................................... 13

I.     LEGAL STANDARD ............................................................................. 13

II.    JUNG BREACHED HIS NON-DISCLOSURE AND INVENTION ASSIGNMENT
      AGREEMENT ....................................................................................... 15

III.   JUNG VIOLATED THE DTSA AND NEW YORK COMMON LAW ....................... 17

IV.   ABSENT AN INJUNCTION, PULSEDATA WILL SUFFER IMMEDIATE AND
      IRREPARABLE HARM ......................................................................... 18

V.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF GRANTING PRELIMINARY
      INJUNCTIVE RELIEF TO PULSEDATA ........................................... 20

VI.   GRANTING PRELIMINARY INJUNCTIVE RELIEF TO PULSEDATA WILL
      SERVE THE PUBLIC INTEREST ....................................................... 21

CONCLUSION ................................................................................................. 22

## **TABLE OF AUTHORITIES**

### CASES

*Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744 (MAD/TWD),
    2021 WL 66563, at *2 (N.D.N.Y. Jan. 7, 2021) ..................................... 13

American Institute of Chemical Engineers v. Reber-Friel Co.,
    682 F.2d 382, 387 (2d Cir. 1982) ....................................................... 14

Benihana, Inc. v. Benihana of Tokyo, LLC,
    784 F.3d 887, 895 (2d Cir. 2015) ....................................................... 13

*BP Prods. N. Am. Inc. v. Motor Parkway Amoco*, No. CV–06–0833 (SJF)(ARL),
    2006 WL 6928862, at *5 (E.D.N.Y. August 21, 2006) ........................... 20

FMC Corp. v. Taiwan Tainan Giant Indus. Co.,
    730 F.2d 61, 63 (2d Cir. 1984) ........................................................... 18

Greenfield v. Philles Records,
    98 N.Y.2d 562, 569 (2002) ................................................................ 13

*JTH Tax, Inc. v. Sawhney*, No. 19-cv-4035 (AJN),
    2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019) ............................... 21

*Kraus USA, Inc. v. Magarik*, No. 17-CV-6541,
    2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) ............................... 14

Lumex, Inc. v. Highsmith,
    919 F. Supp. 624, 628 (E.D.N.Y. 1996) ............................................... 18

*Mason v. AmTrust Fin. Servs.*,
    848 F. App'x 447, 449 (2d Cir. 2021) .................................................. 13

Mercer Health & Benefits LLC v. Digregorio,
    307 F. Supp. 3d 326, 351 (S.D.N.Y. 2018) ........................................... 21

N. Atl. Instruments, Inc. v. Haber,
    188 F.3d 38, 49 (2d Cir. 1999) ..................................................... 16, 17

*Poller v. BioScrip, Inc.*,
    974 F. Supp. 2d 204, 215 (S.D.N.Y. 2013) ........................................... 13

Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC,
    468 F. App'x 43, 46 (2d Cir. 2012) ..................................................... 16

*Uni-World Capital L.P. v. Preferred Fragrance, Inc.*,
   73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014) ................................................................ 21

*Vringo, Inc. v. ZTE Corp.*, No. 14-cv-4988 (LAK),
   2015 WL 3498634, at *5 (S.D.N.Y. June 3, 2015) ................................................. 16

*Webcraft Techs., Inc. v. McCaw*,
   674 F. Supp. 1039, 1041 (S.D.N.Y. 1987) ............................................................... 19

## STATUTES

18 U.S.C. § 1836 ............................................................................................................ 14
18 U.S.C. § 1836(3)(A)(i),(ii) ....................................................................................... 14
18 U.S.C. § 1839(3) ................................................................................................. 14, 17
18 U.S.C. § 1839(5)(B) .................................................................................................. 17

## INTRODUCTION

A preliminary injunction is necessary to prevent Defendant Jung Hoon Son ("Dr. Jung")[1] from continuing to violate his contractual and statutory non-disclosure obligations to his former employer, plaintiff pulseData, Inc. ("pulseData").  Dr. Jung committed brazen acts of trade secret misappropriation and egregiously violated his contractual non-disclosure covenants when he secretly consulted for SmarterDx, a pulseData competitor in the field of AI-aided medical diagnosis, while still being employed by pulseData.  Dr. Jung uploaded computer source code and other proprietary pulseData intellectual property to SmarterDx's systems, and worked with SmarterDx's founders to revamp SmarterDx's products using pulseData's trade secrets.  Despite pulseData's extensive efforts to resolve this matter without court intervention, Dr. Jung has continued to obfuscate and refused to cooperate with pulseData in securing its intellectual property and remediating his conduct.  Dr. Jung has not returned pulseData intellectual property, and has refused to confirm that he will not use it.  Absent a Court order, Jung has demonstrated he will likely continue using and disclosing pulseData's intellectual property for his personal gain and that of pulseData's competitors.  During the pendency of this litigation, pulseData must protect its trade secrets, and through his refusal to cooperate, Dr. Jung presents an imminent and ongoing threat to pulseData and its wellbeing that cannot be compensated purely through economic means.

Dr. Jung's answer to the Complaint contains stunning admissions.  These admissions by themselves justify the limited preliminary injunction that pulseData seeks by way of this motion.  Dr. Jung admits that when pulseData employed him as a Senior Bioinformaticist in 2017, he executed the "Employee Non-Disclosure and Invention Assignment Agreement" ("NDA") attached to the Complaint.  He further admits the NDA is valid and enforceable.  In the NDA, Dr.

---

[1]  While "Jung Hoon" is Dr. Son's first name and "Son" is his last name, Jung Hoon Son goes professionally by "Dr. Jung."

Jung acknowledged that while employed by pulseData, he would have access to pulseData's highly confidential and proprietary intellectual property, and that his use or disclosure of that information for any purpose other than strictly for pulseData's business would cause irreparable damage to pulseData, and he agreed that pulseData is entitled to injunctive relief to prevent his breach or *threatened* breach of the agreement.  What is more, Dr. Jung admits to moonlighting for SmarterDx while still employed by pulseData.  Although Dr. Jung denies sharing pulseData information with SmarterDx, pulseData caught him in the act using pulseData's own computer to log into SmarterDx's workspace and source code repository and transfer to SmarterDx a significant volume of pulseData proprietary information, including its computer source code.  This conduct is documented with indisputable forensic images and artifacts.  Even after his termination, Dr. Jung has refused to certify that he has returned pulseData's information or that he will not use it in violation of his NDA, and therefore without a court order, pulseData will suffer irreparable harm in the form of disclosure of its trade secret information.  Dr. Jung's admissions and documented conduct justifies the limited preliminary injunction pulseData seeks, which will force Dr. Jung to comply with his contractual obligations and ensure pulseData's files and documents are secure. The relief pulseData seeks will not prevent or interfere with Dr. Jung's employment, including within the AI-assisted medical diagnostic field or for pulseData's competitors.

Thus, pulseData seeks a preliminary injunction to enforce Dr. Jung's NDA by (1) prohibiting Dr. Jung from disclosing and/or using any of pulseData's confidential and/or trade secret information; and (2) requiring Dr. Jung to return all originals and copies of all pulseData trade secrets, confidential information, proprietary information, or other pulseData property.

## STATEMENT OF FACTS

### A.      Overview of Jung's Violations

pulseData, a healthcare data science company focused on predictive algorithms, hired Dr.

Jung in 2017.  *See* Declaration of Hai Po Sun ("Sun Decl.") ¶ 6.  Dr. Jung worked for pulseData

for more than five years as Senior Bioinformaticist.[2]  *Id.*  In that role, Dr. Jung had access to

pulseData's most proprietary information, including technical materials, source code, data

visualizations, presentations, client data, and other confidential and sensitive documents.  *Id.*

Some of pulseData's confidential and proprietary information concerns pulseData's (1) predictive

models; (2) model explainability tools; and (3) unique datasets, such as patient data (collectively,

the "pulseData Information").  *Id.* ¶ 36.

 In fall 2022, Dr. Jung gave notice that he would resign from pulseData, and he signed a

standard employment separation agreement terminating his employment.  *Id.* ¶¶ 14-15.

Unbeknownst to pulseData, however, and in explicit breach of his employment contract with

pulseData, Dr. Jung had been acting as a double agent—working simultaneously for both pulseData

and one of its competitors, SmarterDx, and sending confidential proprietary pulseData intellectual

property to SmarterDx.[3]  *Id.* ¶ 21.

 During Dr. Jung's final days at pulseData, pulseData employees examined Dr. Jung's

company-issued laptop and caught Dr. Jung in the act.  *Id.* ¶ 16.  They found Dr. Jung logged into

SmarterDx's digital workspace while at work for pulseData.  *Id.*  Additional investigation revealed

that Dr. Jung had been working as a contractor for SmarterDx for the last several weeks and had

uploaded over seventy pulseData files to SmarterDx's digital workspace, including at least one file

of computer source code.  *Id.* ¶ 18.

 Upon learning about Dr. Jung's unauthorized download of pulseData Information,

pulseData demanded its return, along with an accounting of the stolen pulseData information.  *Id.*

¶ 23.  Dr. Jung initially said that he would "comply fully" and provided a "Documentation of

---

[2] Jung admitted as much in his Answer.  *See* Dkt. No. 10 ¶¶ 1–3.
[3] Jung admitted in his Answer that he worked simultaneously at pulseData and SmarterDx.  *See* Dkt. No. 10 ¶¶ 1–3.

Materials Shared", in which he represented "[t]here is no pulseData codebase downloaded anywhere that [he] ha[s] access to or SmarterDx employees." *Id.* ¶ 24. In response to pulseData's question about which of its confidential information and trade secrets Dr. Jung had shared, with whom, and how, Dr. Jung listed only "screenshots" and "sample sets of routinely available healthcare data," along with "non-pulseData visualization work." Ex. E, Documentation of Materials Shared, at 2-3.[4] pulseData's investigation revealed that these were lies. *Id.* ¶ 25.

In fact, Dr. Jung had uploaded pulseData computer source code directly into SmarterDx's Slack workspace and used pulseData's code to create data visualizations for SmarterDx. *Id.* ¶ 27. Dr. Jung had helped SmarterDx revamp its product based on pulseData's source code, and assisted SmarterDx with a pitch to a prospective pulseData customer using pulseData's own trade secrets. *Id.* ¶ 30. Dr. Jung also attempted to cover his tracks and delete the records of his misappropriation, including multiple Slack messages and files. *Id.* ¶ 31.

### B. pulseData's Trade Secret

pulseData is a healthcare data science company, focused on predictive algorithms for Chronic Kidney Disease ("CKD") and other chronic diseases. *See* Declaration of Hai Po Sun ("Sun Decl.") ¶ 4. pulseData's proprietary algorithms identify individuals who are likely suffering from CKD, frequently even before a diagnosis claim is found, and predict who is headed towards kidney failure, enabling early and proactive intervention. *Id.*

pulseData has raised $16.5 million in series A funding and has a multi-million dollar valuation, derived, at least in part, from its revolutionary data intelligence platform for predicting the progression of kidney disease. *Id.* ¶ 5. This data intelligence platform cost pulseData millions of dollars to design and develop and is an essential trade secret of the company. *Id.* Any

---

[4] In accordance with Hon. Jesse M. Furman's Rule 7.A, proprietary and trade secret information has been redacted from Exhibit E.

disclosure of pulseData trade secret information would cause irreparable harm because of the amount of time and money pulseData has spent on developing its trade secret information, especially to a competitor like SmarterDx who can use the trade secret information to steal clients and undercut pulseData's competitive advantage and ability to raise additional funds.  *Id.*

**C.      Dr. Jung's Employee Non-Disclosure and Invention Assignment Agreement**

On June 2, 2017, pulseData hired Dr. Jung as a Senior Bioinformaticist, and, on February 8, 2020, Dr. Jung was promoted to Director of Informatics.  *Id.* ¶ 6.  His role included developing and identifying clinical and population health care pathways, developing data pipeline systems, interpreting and normalizing large data sets from client health care systems, and integrating pulseData software into enterprise data warehouses, CRM systems, and reporting tools.  *Id.*  Dr. Jung had access to some of pulseData's most proprietary information, including technical materials, source code, data visualizations, presentations, client data, and other confidential and sensitive documents.  *Id.*

Prior to starting employment at pulseData, Dr. Jung signed an "Employee Non- Disclosure and Invention Assignment Agreement" ("NDA").[5]  *Id.* ¶ 7.  Dr. Jung directly admits that the NDA is valid and enforceable.  Dkt. No. 10 ¶ 52.  In the NDA, Dr. Jung acknowledged that as part of his role he would have access to confidential and proprietary information, including "technical data, trade secrets or know-how, including, but not limited to, research, product plans, … customer lists and customers, … software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information."  He also acknowledged several obligations he had regarding this information.  Sun Decl. ¶ 8.

---

[5] Jung admitted as much in his Answer.  *See* Dkt. No. 10 ¶ 13.

*First*, Dr. Jung agreed not to use or disclose, during or after termination, "any of [pulseData's] Confidential Information except as authorized by [pulseData's] management … , and then only pursuant to a written non-disclosure agreement that sufficiently protects the Confidential Information."[6]  *Id.* ¶ 9.  *Second*, Dr. Jung agreed that, upon termination of his employment, he would "deliver to [pulseData] … any and all devices, records, data, notes, reports, proposals, lists, correspondence (including emails), specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by [Dr. Jung] pursuant to [Dr. Jung's] employment with [pulseData] or otherwise belonging to [pulseData]."  *Id.* ¶ 10.  *Third*, Dr. Jung agreed to "not engage in any other employment, occupation or consulting related to the business in which [pulseData] is now involved or becomes involved during the term of [his] employment."  *Id.* ¶ 11.  *Fourth*, Dr. Jung agreed to "not, either directly or indirectly, interfere with [pulseData's] customer relationships" during the course of his employment and for one year following his termination.[7]  *Id.* ¶ 12.  Dr. Jung acknowledged that as part of his role he would have access to confidential and proprietary information and agreed not to use or disclose, during or after termination, any pulseData Confidential Information except as authorized by pulseData's management.  *Id.* ¶¶ 14-15.  Jung further "agree[d] that it would be impossible or inadequate to measure and calculate [pulseData's] damages from [] breach of … this Agreement" and that "[pulseData] will have … the right to obtain an injunction … restraining such breach or threatened breach and to specific performance of any such provision of this Agreement."  Ex. A, NDA Section 11(b).

---

[6] Jung admitted as much in his Answer.  *See* Dkt. No. 10 ¶ 15.
[7] Jung admitted as much in his Answer.  *See* Dkt. No. 10 ¶ 18.

### D.     Jung Secretly Moonlighted for a Competitor While Employed by pulseData

On October 27, 2022, Dr. Jung gave notice that he would resign from pulseData.  *Id.* ¶ 14. On November 3, 2022, Dr. Jung signed an employment separation agreement ("Separation Agreement") terminating his employment as of November 17, 2022.  *Id.* ¶ 15.  Dr. Jung's last day of work at pulseData was on November 14, 2022.  *Id.* ¶ 16.   At his exit interview, pulseData took possession of his company laptop.  When pulseData opened the laptop, it observed that Dr. Jung was logged into the Slack workspace—an instant messaging program for professionals—of SmarterDx.  *Id.*

SmarterDx is a competing company in pulseData's space that uses an AI tool to perform second level reviews of patient charts to generate additional revenue for hospitals, focusing on Clinical Documentation Improvement and Medical Coding for acute care patients.  *Id.* ¶ 17.

The revelation that Dr. Jung was logged into SmarterDx's Slack workspace raised concerns that Dr. Jung had shared pulseData Information with SmarterDx.  Indeed, after conducting further review, pulseData discovered that Dr. Jung uploaded at least 77 files to SmarterDx's Slack workspace, including at least one file of pulseData computer code.  *Id.* ¶ 18.  The information Dr. Jung stole and misappropriated relate to pulseData's predictive models, proprietary model explainability tools, and unique datasets.  *Id.* ¶ 36.  It concerns the specific algorithmic approach or methodology used to develop pulseData's predictive models, the specific parameters used to train and fine-tune the algorithm, the specific hardware or cloud infrastructure used to train and deploy the predictive algorithm, and specific business processes or workflows used to integrate the predictive algorithm into healthcare operations.  *Id.*   Other information concerns pulseData's proprietary model explainability tools, data visualization and care summary which are used to explain predictive analytics results to actual users.  *Id.*   Still other information concerns

pulseData's unique datasets, such as patient data from a particular geographic region or electronic health records from a specific hospital network, that provide valuable insights and features for the algorithm.  *Id.*  Dr. Jung's disclosure of pulseData Information to a competitor was not authorized by pulseData.  *Id.* ¶ 19.

pulseData also discovered that Dr. Jung was using a SmarterDx email address as early as October 23, 2022.  *Id.* ¶ 20.  On information and belief, Dr. Jung had moonlighted as a contractor for SmarterDx for at least 10 hours per week from October 24, 2022 to November 17, 2022 while he was simultaneously employed at pulseData.  *Id.* ¶ 21.

### E.     Jung's Coverup

Upon discovering and learning of Dr. Jung's misconduct, pulseData diligently took steps to investigate and protect its confidential and sensitive information, including hiring Latham & Watkins LLP ("Latham") as counsel.  *Id.* ¶ 22.  Two days after taking possession of Dr. Jung's company laptop, Latham sent Dr. Jung a cease and desist letter on November 16, 2022, asking Dr Jung to, among other things, "[p]rovide a detailed, written account of what pulseData Confidential Information, [he] accessed and/or downloaded prior to or since [he] signed the Employment Separation Agreement—other than in connection with your employment at pulseData—and what [he] did with that information, including details on any devices or accounts to which you transferred the information."  *Id.* ¶ 23.  Dr. Jung responded by email the next day (1) stating that he would "comply fully" and (2) providing a "Documentation of Materials Shared" with SmarterDx. Dr. Jung also retained outside counsel.  *Id.* ¶ 24.

Since that date, pulseData's investigation has revealed that Dr. Jung's representations in his "Documentation of Materials Shared" were false and misleading.  *Id.* ¶ 25.  In his "Documentation of Materials Shared," Dr. Jung represented that "[t]here is no pulseData codebase downloaded anywhere that [he] ha[s] access to or SmarterDx employees."  *Id.* ¶ 26.  In response

to pulseData's question about which of its confidential information and trade secrets Dr. Jung had shared, with whom, and how, Dr. Jung listed only "screenshots of care summaries" and "sample sets of routinely available healthcare data," along with "non-pulseData visualization work." *Id.* pulseData's investigation revealed that, just three days prior, Dr. Jung had uploaded pulseData code directly into SmarterDx's Slack workspace. He also used pulseData's code to create data visualizations for SmarterDx. *Id.* ¶ 27.

In his "Documentation of Materials Shared," Dr. Jung also said that he had shared a limited amount of pulseData's confidential information with only Josh Geleris, SmarterDx's co- founder and Head of Product. *Id.* ¶ 28. pulseData's investigation revealed, however, that Dr. Jung shared a significant volume of information with a wider group of SmarterDx executives and officers, including its CEO Michael Gao. *Id.* ¶ 29. Additionally, pulseData's investigation revealed that Dr. Jung had helped SmarterDx revamp its product based on pulseData's source code, and assisted SmarterDx with a pitch to a prospective pulseData customer using pulseData's own trade secrets. *Id.* ¶ 30. Dr. Jung also attempted to cover his tracks and delete the records of his misappropriation, including multiple Slack messages and files. His conduct was both willful and malicious. *Id.* ¶ 31.

On March 17, 2023, Latham sent Dr. Jung's counsel a demand letter. *Id.* ¶ 32. Dr. Jung's counsel requested several extensions of time to respond, before finally informing Latham that her firm was no longer retained by Dr. Jung. She did not substantively respond to the demand letter. *Id.* ¶ 33. Dr. Jung has also continued to ignore all attempts to contact him. *Id.* ¶ 34.

After pulseData filed and served its lawsuit against Dr. Jung, Thomas G. Pasternak from Akerman LLP contacted pulseData on May 16, 2023 and claimed to represent Dr. Jung. *See* Declaration of Steven J. Pacini ("Pacini Decl.") ¶ 2, 3. Pasternak requested an extension to respond to pulseData's complaint and pulseData granted a ten day extension until June 2, 2023 on the

condition that the parties were moving towards the proposed consent judgment and resolution. *Id.* ¶ 3, 4. pulseData did not hear from Pasternak for two weeks. *Id.* ¶ 5. On June 1, 2023, Pasternak requested another extension and stated that Dr. Jung would answer the complaint. *Id.* ¶ 5. That same week, pulseData also discovered that Dr. Jung had posted on LinkedIn and GoFundMe about this litigation. Sun Decl. ¶ 34. Dr. Jung has not indicated that he does not have and is not actively sharing pulseData information with SmarterDx or other pulseData competitors, and has not agreed to return data or allow for forensic inspection of his devices. *Id.* Through Dr. Jung's actions and refusal to cooperate, pulseData has a reasonable belief that he is or intends to continue sharing pulseData information and that without a court order, pulseData will suffer irreparable harm.

## ARGUMENT

### I.   LEGAL STANDARD

A party is entitled to a preliminary injunction upon a showing of: "(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *See, e.g.*, *Mason v. AmTrust Fin. Servs.*, 848 F. App'x 447, 449 (2d Cir. 2021) (citing *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015)).

New York law recognizes that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002). "A non-disclosure agreement is evaluated in the same manner as other restrictive covenants." *Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744 (MAD/TWD), 2021 WL 66563, at *2 (N.D.N.Y. Jan. 7, 2021). "A restraint is reasonable only

if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 215 (S.D.N.Y. 2013).   Employers "have a legitimate business interest in protecting the goodwill they have fostered with their customers" and "safeguard[ing] [their] confidential information." *Adecco*, 2021 WL 66563, at *3 (citing *American Institute of Chemical Engineers v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982)).

The Defend Trade Secrets Act of 2016 ("DTSA") provides a private cause of action for the misappropriation of trade secrets related to a product or service used in interstate or foreign commerce, and provides for injunctive relief to prevent actual or threatened misappropriation.  18 U.S.C. § 1836.  Under the DTSA, the Court may enjoin "[a]ctual or threatened misappropriation" and require "affirmative actions to be taken to protect the trade secret."  *See* 18 U.S.C. § 1836(3)(A)(i),(ii).  A "trade secret" is defined by the DTSA to include:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep the information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

The elements of a misappropriation of trade secrets claim under the DTSA "are fundamentally the same" as those under New York common law.  *Kraus USA, Inc. v. Magarik*, No. 17-CV-6541, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (internal quotations omitted).

14

As established below, pulseData can satisfy each of these elements.

## II.     JUNG BREACHED HIS NON-DISCLOSURE AND INVENTION ASSIGNMENT AGREEMENT

Dr. Jung executed a valid and binding NDA with pulseData.  The NDA contains express provisions to protect pulseData's proprietary and confidential information.  Specifically, through the NDA, Dr. Jung acknowledged that as part of his role he would have access to confidential and proprietary information and agreed, through the NDA, not to use or disclose, during or after termination, any pulseData Confidential Information except as authorized by pulseData's management.  *Id.* ¶¶ 14-15.  Jung further "agree[d] that it would be impossible or inadequate to measure and calculate [pulseData's] damages from [] breach of … this Agreement" and that "[pulseData] will have … the right to obtain an injunction … restraining such breach or threatened breach and to specific performance of any such provision of this Agreement."  Ex. A, NDA Section 11(b).

Dr. Jung violated the express terms of his NDA when he shared pulseData trade secrets with SmarterDx without authorization.  Dr. Jung's actions have harmed, and continue to cause harm to pulseData.  Indeed, in addition to exposing pulseData's valuable trade secrets to a competitor, Dr. Jung has remained defiant in assisting pulseData in retrieving and safeguarding the materials that he misappropriated.  Dr. Jung refuses to cooperate or give pulseData any assurances that he has not retained pulseData trade secrets or that he will in the future comply with the requirements of the NDA.  pulseData worked for months to try and get Dr. Jung to cooperate in an investigation and allow a forensic firm to inspect his machines and devices to see what he possesses.  pulseData also asked for a signed affidavit.  Dr. Jung intially indicated through counsel that he would cooperate, but he never followed through.  pulseData cannot wait any longer and Dr. Jung's recent LinkedIn and GoFundMe posts indicate his willingness and ability to publicly

disclose information regarding pulseData.  Dr. Jung has offered no justification or defense of his

actions in his Answer and has been caught lying to pulseData about the scope and nature of his

breach of the NDA.  pulseData has collected forensic evidence demonstrating Dr. Jung's breach,

his lies and coverup, and his lack of cooperation.  In such circumstances, pulseData has already

demonstrated a likelihood of success on the merits with respect to Dr. Jung's breach.

In light of the above, enforcement of the NDA's express terms is more than appropriate

and pulseData would likely succeed on any challenge to the propriety or scope of the NDA.  *First*,

New York courts have frequently found similar non-disclosure agreements to be enforceable.  *See,

e.g.*, *Adecco*, 2021 WL 66563, at *3 (finding a non-dislosure agreement enforceable because "a

non-disclosure provision … prohibiting the disclosure of information regarding [employer's]

internal workings, business strategies, and customized software does not impose an undue burden

on [former employee]" and is not "injurious to the public"); *Vringo, Inc. v. ZTE Corp.*, No. 14-cv-

4988 (LAK), 2015 WL 3498634, at *5 (S.D.N.Y. June 3, 2015) ("The NDA's Confidentiality

Provision is Enforceable").

*Second,* pulseData is not seeking to prevent Dr. Jung from working in the field of medical

AI.  There is no "undue hardship" for Jung to simply refrain from disclosing or using any pulseData

Confidential Information, as he explicitly agreed to in the NDA.  Further, Jung's acknowledgment

in the NDA that a breach constitutes irreparable harm and entitles pulseData to injunctive relief

further supports a finding that injunctive relief is necessary.  *See, e.g.*, *Singas Famous Pizza Brands

Corp. v. N.Y. Advert. LLC*, 468 F. App'x 43, 46 (2d Cir. 2012) ("[A] defendant's agreement to such

contractual provisions might arguably be viewed as an admission [] that plaintiff will suffer

irreparable harm were defendant to breach the contract."); *N. Atl. Instruments, Inc. v. Haber*, 188

F.3d 38, 49 (2d Cir. 1999) (finding irreparable injury in light of, inter alia, the defendant's

acknowledgement in his employment agreement "that a breach of the confidentiality clause would cause 'irreparable injury'" to the plaintiff).

III.     **JUNG VIOLATED THE DTSA AND NEW YORK COMMON LAW**

"New York law imposes a duty not to use trade secrets in competition with a former employer."  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 47 (2d Cir. 1999).  DTSA defines misappropriation as the "disclosure or use of a trade secret of another without express or implied consent."  18 U.S.C. § 1839(5)(B).

The information Dr. Jung stole and misappropriated relate to pulseData's predictive models, proprietary model explainability tools, and unique datasets.  Sun Decl. ¶ 36.  This information constitutes trade secrets under both the DTSA and New York common law because the information is not generally known and pulseData takes great lengths to protect its confidential and trade secret information.  *Id.* at 48; *see* 18 U.S.C. § 1839(3).  For example, pulseData requires its employees to sign an Employee Non-Disclosure and Invention Assignment Agreement, including Dr. Jung, which prohibits employees from using or disclosing to anyone any pulseData confidential and/or proprietary information without prior written authorization.  Sun Decl. ¶ 49.  Additionally, pulseData stores its confidential and/or proprietary information on platforms in which access is secured with enforced multi-factor authentication and limited to only pulseData employees and executives.  *Id.* ¶¶ 48, 50.  Further, pulseData utilizes role-based access control so users only have access to the services and information necessary to fulfill their job functions.  *Id.* ¶ 50.  pulseData has used and still uses this pulseData Information in interstate commerce.

pulseData's trade secrets are valuable.  The data visualizations and source code are important trade secrets containing information critical to business development of both existing and new clients and represent a substantial investment of time and money by pulseData to develop.  *Id.* ¶ 47.  pulseData developed its proprietary technology over years of research and millions of

dollars in development costs.  *Id.* ¶ 46.  pulseData's predictive models, proprietary model explainability tools, and unique datasets are not available publicly and would take substantial effort to independently develop.  *Id.*  A competitor with access to this information would obtain valuable proprietary technology that it could use to develop new and existing clients.  *Id.*  The confidential trade secret information Dr. Jung misappropriated is the core basis for pulseData's multi-million dollar valuation.  *Id.* ¶ 37.

It is critical to pulseData's success as a company that these misappropriated files be retrieved and destroyed.   As long as these files are out of pulseData's control, it is possible that they could be leaked onto the Internet, held for ransom, or provided to even more competitors.   Any competitor with access to these files could obtain valuable proprietary technology worth years of research and millions of dollars of development costs.  *Id.* ¶ 40.  The data visualizations and source code are important trade secrets containing information critical to business development of both existing and new clients.   They represent a substantial investment of time and money by pulseData.  *Id.* ¶ 41.

## IV.    ABSENT AN INJUNCTION, PULSEDATA WILL SUFFER IMMEDIATE AND IRREPARABLE HARM

"Irreparable harm is presumed where a trade secret has been misappropriated."  *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 628 (E.D.N.Y. 1996).  "A trade secret once lost is, of course, lost forever" and, as a result, such a loss "cannot be measured in money damages."  *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984).

pulseData's trade secrets are the core basis for pulseData's multi-million dollar valuation. Sun Decl. ¶ 37.  These trade secrets have already been shared with one competitor, SmarterDx, and Dr. Jung may share them with others.  As long as these files are out of pulseData's control, it is possible that they could be leaked onto the Internet, held for ransom, or provided to even more

competitors.   The theft of information by Dr. Jung has caused, and will continue to cause irreparable harm to pulseData unless a preliminary injunction is granted enjoining Dr. Jung from disclosing, using, and communicating with any parties any of pulseData's confidential and/or trade secret information and requiring Dr. Jung to return to pulseData all originals and copies of pulseData confidential and trade secret information.   Further, Dr. Jung "agree[d] that it would be impossible or inadequate to measure and calculate [pulseData's] damages from [] breach of … this [NDA] Agreement."   NDA Section 11(b).   Because Jung admitted that the NDA is valid and enforceable, his breach of the NDA has necessarily already caused pulseData irreparable harm.

In *Webcraft Techs., Inc. v. McCaw*, the court considered a similar situation where an employee "conceal[ed] both the fact of her expected departure and that she was going to a competing firm" for three weeks.  674 F. Supp. 1039, 1041 (S.D.N.Y. 1987).  During those three weeks, the employee "passed confidential [] information to [the competing firm]."  *Id.*  The competing firm used the confidential information to prepare price quotes to prospective and existing customers.  *Id.*  The court in *Webcraft* found that plaintiff was "entitled to a preliminary injunction" enjoining defendant employee "from disclosing confidential proprietary information," soliciting or servicing any customer for two years, and requiring defendant to return any documents obtained in the course of her employment because the employee "embezzled and converted valuable trade secrets of her employer, passing them on to her future employer." *Webcraft*, 674 F. Supp. at 1040, 1042, 1048.

Likewise, here, Dr. Jung concealed that he had been working as a double agent for both pulseData and SmarterDx, passed pulseData confidential information to SmarterDx, and helped SmarterDx with customer pitches using pulseData trade secrets.  Sun Decl. ¶ 39.  Because of Dr. Jung's concealment and cover up, pulseData does not know everything that he stole, where he

may have copied or stored it, and to whom he may have sent pulseData confidential information.

Recent social media postings by Dr. Jung add to the concern that while Jung postures cooperation, he ultimately does not cooperate and will not formally attest, affirm, or provide any reasonable assurances that he does not still possess pulseData information and will comply with his obligations.  Dr. Jung's recent LinkedIn and GoFundMe posts indicate his willingness and ability to publicly disclose information regarding pulseData.  Thus, this latest development combined with the lack of communication from Dr. Jung's attorney, is further support for a preliminary injunction.

## V.      THE BALANCE OF EQUITIES TIPS IN FAVOR OF GRANTING PRELIMINARY INJUNCTIVE RELIEF TO PULSEDATA

The equities strongly favor pulseData.  The balance of hardships weighs in favor of pulseData facing loss of its trade secrets and confidential information where the only hardship to the other party is to comply with contract and trade secret laws.  Dr. Jung will face no undue hardship—he needs only to comply with his contractual and legal obligations, both of which require that Dr. Jung stop sharing and disclosing pulseData's trade secrets.  *See BP Prods. N. Am. Inc. v. Motor Parkway Amoco*, No. CV–06–0833 (SJF)(ARL), 2006 WL 6928862, at *5 (E.D.N.Y. August 21, 2006) (finding that "any hardship suffered" by a party upon enforcement of a contractual obligation "is mitigated by the fact that [the party] specifically agreed to" the obligation).  Furthermore, Dr. Jung willingly entered into the Non-Disclosure Agreement and admits that it is valid and enforceable.  *See* D.I. 10 ¶ 52.  Dr. Jung does not dispute and admits that he has an obligation to not use or disclose any of pulseData's Confidential Information without authorization.  *Id.* ¶ 15.  Dr. Jung does not dispute and admits that he has an obligation to "not, either directly or indirectly, interfere with [pulseData's] customer relationships."  *Id.* ¶ 18.  The only real dispute appears to be whether the information Dr. Jung misappropriated is a

trade secret. *Id.* at "Affirmative Defenses" ¶ 4, 5.  However, employers own their documents and information, and Dr. Jung should not be allowed to continue using and sharing pulseData's information, which would cause major, irreparable harm to pulseData, simply because he may later argue that the information was not a trade secret or otherwise protected.  On the other hand, absent an injunction, pulseData will be unable to effectively control its own confidential and trade secret information that it spent years and millions of dollars to develop.    The equities favor granting pulseData's requested injunction.

## VI.     GRANTING PRELIMINARY INJUNCTIVE RELIEF TO PULSEDATA WILL SERVE THE PUBLIC INTEREST

Enjoining Dr. Jung from using and disclosing pulseData's trade secrets and requiring him to return all original or copies of pulseData's files and information would serve the public interest. "[T]he public interest would be advanced by [] an injunction, because … an injunction would tend to encourage parties to abide by their agreements."  *Mercer Health & Benefits LLC v. Digregorio*, 307 F. Supp. 3d 326, 351 (S.D.N.Y. 2018) (quoting *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014)); *see also JTH Tax, Inc. v. Sawhney*, No. 19-cv-4035 (AJN), 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019) ("injunctive relief would serve the public interest by ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced").

Dr. Jung voluntarily agreed to the terms of the Non-Disclosure Agreement when he accepted employment at pulseData.  Dr. Jung admits that he has obligations under the Non-Disclosure Agreement that are valid and enforceable.  D.I. 10 ¶¶ 12-19.  Since Dr. Jung has received the benefit of his bargain, he should also uphold his own obligations under the Non-Disclosure Agreement to not use or disclose any of pulseData's Confidential Information without authorization.  Regardless of whether certain pulseData information is Confidential Information

or a trade secret, there is no public interest in allowing Dr. Jung to disclose or share *any* pulseData information.  On the other hand, the public interest would be served by ensuring that reasonable restrictive covenants like the non-disclosure clause into which Dr. Jung and pulseData voluntarily entered are enforced.

## CONCLUSION

WHEREFORE, pulseData respectfully requests that the Court issue a preliminary injunction prohibiting Dr. Jung from (1) disclosing and/or using any of pulseData's confidential and/or trade secret information; (2) and requiring that he return to pulseData all originals and copies of all pulseData trade secrets, confidential information, proprietary information, or other pulseData property.

Dated: June 30, 2023
    New York, New York

Respectfully submitted,

/s/ *Matthew S. Salerno*
Matthew S. Salerno
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020-1401
Phone: 212.906.1200
Email: matthew.salerno@lw.com

*Attorneys for pulseData, Inc.*