UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT
OF NEW YORK

| | |
|---|---|
| PULSEDATA, INC., <br> *Plaintiff,* <br> v. <br> JUNG HOON SON, <br> *Defendant,* | ) ) ) ) ) ) ) ) ) ) |

Civ. No. 1:23-cv-03653-JMF

**JURY TRIAL DEMANDED**

**DECLARATION OF HAI PO SUN**

HAI PO SUN, pursuant to 28 U.S.C. § 1746 declares under penalty of perjury as follows:

1. I am over the age of 18 years old, and reside in New York, New York. I serve as the Chief Technology Officer ("CTO") for Plaintiff pulseData, Inc. ("pulseData"). I received my Masters of Engineering, Electrical Engineering, and Computer Science degree and Bachelor of Science, Electrical Engineering, and Computer Science from MIT. I submit this declaration in support of pulseData's Motion for Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and am competent to testify to such facts if called as a witness.

2. I co-founded pulseData in December 2015. I became the CTO in September 2016.

3. In my role as CTO, I am responsible for overseeing the development and implementation of pulseData's technology strategy, and ensuring that it aligns with our overall business goals and objectives. I also am responsible for designing and implementing the technology infrastructure that supports our data analytics, machine learning, and artificial

intelligence algorithms.

### PULSEDATA IS A HEALTHCARE DATA SCIENCE STARTUP WHOSE VALUE IS BASED ON ITS PROPRIETARY INTELLECTUAL PROPERTY RELATED TO ITS NOVEL ALGORITHMS AND DATA INTELLIGENCE PLATFORM

4. pulseData is a healthcare data science company, focused on predictive algorithms for Chronic Kidney Disease ("CKD") and other chronic diseases. The Centers for Disease Control and Prevention ("CDC") data shows that 40% of adults with late stage CKD do not know they have it. pulseData's proprietary algorithms identify individuals who are likely suffering from CKD, frequently before a diagnosis claim is even found. In addition, pulseData's algorithms predict who is headed towards kidney failure, enabling early and proactive intervention. Its customers include Large Dialysis Organizations ("LDOs"), value based and risk-bearing health systems, Accountable Care Organizations ("ACOs"), and providers participating in value-based care.

5. pulseData has raised $16.5 million in series A funding and has a multi-million dollar valuation, derived, at least in part, from its revolutionary data intelligence platform for predicting the progression of kidney disease. This data intelligence platform has cost pulseData millions of dollars to design and develop and is an essential trade secret of the company. Any disclosure of pulseData trade secret information would cause irreparable harm because of the amount of time and money pulseData has spent on developing its trade secret information, especially to a competitor like SmarterDx who can use the trade secret information to steal clients and undercut pulseData's competitive advantage and ability to raise additional funds.

### PULSEDATA HIRES DR. JUNG AND HE SIGNS A NON-DISCLOSURE AND INVENTION ASSIGNMENT AGREEMENT

6. On June 2, 2017, pulseData hired Jung Hoon Son ("Dr. Jung") as a Senior Bioinformaticist, and, on February 8, 2020, Dr. Jung was promoted to Director of Informatics. His role included developing clinical phenotypes and internal medical ontology library,

identifying clinical and population health care pathways, developing data pipeline systems, interpreting and normalizing large data sets from client health care systems, and integrating pulseData software into enterprise data warehouses, care management platforms, and reporting tools.  Dr. Jung had access to some of pulseData's most proprietary information, including technical materials, source code, data visualizations, presentations, client data, and other confidential and sensitive documents.

7. Prior to starting employment at pulseData, Dr. Jung signed an "Employee Non-Disclosure and Invention Assignment Agreement" (the "Non-Disclosure Agreement").  Attached hereto as Exhibit A is a true and correct copy of Dr. Jung's signed Non-Disclosure Agreement.

8. In the Non-Disclosure Agreement, Dr. Jung acknowledged that as part of his role he would have access to confidential and proprietary information, including "technical data, trade secrets or know-how, including, but not limited to, research, product plans, … customer lists and customers, … software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information."  He also acknowledged several obligations he had regarding this information.

9. *First*, Dr. Jung agreed not to use or disclose, during or after termination, "any of [pulseData's] Confidential Information except as authorized by [pulseData's] management … , and then only pursuant to a written non-disclosure agreement that sufficiently protects the Confidential Information."

10. *Second*, Dr. Jung agreed that, upon termination of his employment, he would "deliver to [pulseData] … any and all devices, records, data, notes, reports, proposals, lists, correspondence (including emails), specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed

by [Dr. Jung] pursuant to [Dr. Jung's] employment with [pulseData] or otherwise belonging to [pulseData]."

11. *Third*, Dr. Jung agreed to "not engage in any other employment, occupation or consulting related to the business in which [pulseData] is now involved or becomes involved during the term of [his] employment."

12. *Fourth*, Dr. Jung agreed to "not, either directly or indirectly, interfere with [pulseData's] customer relationships" during the course of his employment and for one year following his termination.

13. Having signed the Non-Disclosure Agreement, Dr. Jung commenced his employment with pulseData on July 5, 2017.

**UNBEKNOWNST TO PULSEDATA, DR. JUNG BEGINS MOONLIGHTING FOR SMARTERDX AND MISAPPROPRIATING CONFIDENTIAL AND SENSITIVE PULSEDATA INFORMATION**

14. On October 27, 2022, Dr. Jung gave notice that he would resign from pulseData.

15. On November 3, 2022, Dr. Jung signed an employment separation agreement ("Separation Agreement") terminating his employment as of November 17, 2022. Attached hereto as Exhibit B is a true and correct copy of Dr. Jung's Separation Agreement.

16. Dr. Jung's last day of work at pulseData was on November 14, 2022. At his exit interview, pulseData took possession of his company laptop. When pulseData opened the laptop, it observed that Dr. Jung was logged into the Slack workspace—an instant messaging program for professionals—of SmarterDx.

17. SmarterDx is a competing company in pulseData's space that uses an AI tool to perform second level reviews of patient charts to generate additional revenue for hospitals, focusing on Clinical Documentation Improvement and Medical Coding for acute care patients.

18. The revelation that Dr. Jung was logged into SmarterDx's Slack workspace raised

concerns that Dr. Jung had shared pulseData confidential information and trade secrets with SmarterDx. Indeed, after conducting further review, pulseData discovered that Dr. Jung uploaded at least 77 files to SmarterDx's Slack workspace, including at least one file of pulseData source code.

19.  Dr. Jung's disclosure of pulseData's confidential information to a competitor was not authorized by pulseData.

20.  pulseData also discovered that Dr. Jung was using a SmarterDx email address as early as October 23, 2022.

21.  On information and belief, Dr. Jung had moonlighted as a contractor for SmarterDx for at least 10 hours per week from October 24, 2022 to November 17, 2022 while he was simultaneously employed at pulseData.

**WHEN CONFRONTED, DR. JUNG IS NOT FORTHCOMING**

22.  Upon discovering and learning of Dr. Jung's misconduct, pulseData diligently took steps to investigate and protect its confidential and sensitive information, including hiring Latham & Watkins LLP ("Latham") as counsel.

23.  Two days after taking possession of Dr. Jung's company laptop, Latham sent Dr. Jung a cease and desist letter on November 16, 2022, asking Dr Jung to, among other things, "[p]rovide a detailed, written account of what pulseData Confidential Information, [he] accessed and/or downloaded prior to or since [he] signed the Employment Separation Agreement—other than in connection with [his] employment at pulseData—and what [he] did with that information, including details on any devices or accounts to which [he] transferred the information." Attached hereto as Exhibit C is a true and correct copy of the cease and desist letter.

24.  Dr. Jung responded by email the next day (1) stating that he would "comply fully" and (2) providing a "Documentation of Materials Shared" with SmarterDx. Dr. Jung also retained

outside counsel. Attached hereto as Exhibit D is a true and correct copy of Dr. Jung's email response. Attached hereto as Exhibit E is a true and correct copy of Dr. Jung's Documentation of Materials Shared with pulseData proprietary and trade secret information redacted.

25. Since that date, pulseData's investigation has revealed that Dr. Jung's representations in his "Documentation of Materials Shared" were false and misleading.

26. In his "Documentation of Materials Shared," Dr. Jung represented that "[t]here is no pulseData codebase downloaded anywhere that [he] ha[s] access to or SmarterDx employees." In response to pulseData's question about which of its confidential information and trade secrets Dr. Jung had shared, with whom, and how, Dr. Jung listed only "screenshots of care summaries" and "sample sets of routinely available healthcare data," along with "non-pulseData visualization work."

27. pulseData's investigation revealed that, just three days prior, Dr. Jung had uploaded pulseData code directly into SmarterDx's Slack workspace. He also used pulseData's code to create data visualizations for SmarterDx.

28. In his "Documentation of Materials Shared," Dr. Jung also said that he had shared a limited amount of pulseData's confidential information with only SmarterDx's co-founder and Head of Product.

29. pulseData's investigation revealed, however, that Dr. Jung shared a significant volume of information with a wider group of SmarterDx executives and officers, including its CEO.

30. Additionally, pulseData's investigation revealed that Dr. Jung had helped SmarterDx revamp its product based on pulseData's source code, and assisted SmarterDx with a pitch to a prospective pulseData customer using pulseData's own trade secrets.

31. Dr. Jung also attempted to cover his tracks and delete the records of his

misappropriation, including multiple Slack messages and files. His conduct was both willful and malicious.

33. On March 17, 2023, Latham sent Dr. Jung's counsel a demand letter. Attached hereto as Exhibit F is a true and correct copy of the demand letter.

33. Dr. Jung's counsel requested several extensions of time to respond, before finally informing Latham that her firm was no longer retained by Dr. Jung. She did not substantively respond to the demand letter.

34. Dr. Jung has also continued to ignore all attempts to contact him. On or around May 31, 2023, Dr. Jung posted on LinkedIn and GoFundMe about this litigation. Attached hereto as Exhibit G is a true and correct copy of Dr. Jung's posts. Dr. Jung has not indicated that he does not have and is not actively sharing pulseData information with SmarterDx or other pulseData competitors, and has not agreed to return data or allow for forensic inspection of his devices.

**PULSEDATA HAS BEEN, AND WILL BE, SEVERELY HARMED BY DR. JUNG'S MISAPPROPRIATION OF PULSEDATA'S CONFIDENTIAL TRADE SECRET INFORMATION**

35. The theft of information by Dr. Jung has caused, and will continue to cause, irreparable harm to pulseData.

36. The information Dr. Jung stole and misappropriated concerned several aspects of pulseData's trade secrets. Some of the information relates to pulseData's predictive models. In particular, it concerns the specific algorithmic approach or methodology used to develop pulseData's predictive models, and specific business processes or workflows used to integrate the predictive algorithm into healthcare operations. Other information concerns pulseData's proprietary model explainability tools, data visualization, and care summary which are used to explain predictive analytics results to actual users. Still other information concerns pulseData's unique datasets, such as patient data from a particular geographic region or electronic health records from a specific hospital network, that provide valuable insights and features for the

algorithm.

37. The confidential trade secret information Dr. Jung misappropriated is the core basis for pulseData's multi-million dollar valuation.

38. Dr. Jung uploaded at least 77 files to SmarterDx's Slack workspace, including at least one file of source code.

39. Dr. Jung uploaded pulseData's confidential information and trade secrets to a competitor's work-space and source code repository, and then assisted that competitor with revamping its product using and based on pulseData's trade secrets, and with customer pitches using pulseData's own trade secrets.

40. It is critical to pulseData's success as a company that these misappropriated files be retrieved and destroyed.  As long as these files are out of pulseData's control, it is possible that they could be leaked onto the Internet, held for ransom, or provided to even more competitors.  Any competitor with access to these files could obtain valuable proprietary technology worth years of research and millions of dollars of development costs.

41. The data visualizations and source code are important trade secrets containing information critical to business development of both existing and new clients.  They represent a substantial investment of time and money by pulseData.

### PULSEDATA TAKES DILIGENT STEPS TO PROTECT THE TRADE SECRETS DR. JUNG MISAPPROPRIATED

42. pulseData goes to great lengths to protect its confidential and trade secret information.  pulseData maintains the information in secure and encrypted file storage to which only approved pulseData employees and executives have access.

43. To protect its proprietary customers, prospective customers, and product and services information, pulseData requires its employees sign an Employee Non-Disclosure and Invention Assignment Agreement.  This Agreement prohibits employees from using or disclosing

to anyone, any of pulseData's confidential and/or proprietary information without prior written authorization.

44.     Additionally, pulseData stores its confidential and/or proprietary information on platforms in which access is secured with enforced multi-factor authentication (i.e., before accessing the information, a user must provide multiple ways of authenticating their identity (for example, a password and an approval pushed to the user's registered device)). Further, pulseData utilizes role-based access control so users only have access to the services and information necessary to fulfill their job functions.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 30 day of June 2023 in New York, New York.

_____
Hai Po Sun
pulseData, Inc.